**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

QCX LLC, d/b/a Polymarket US,

*Plaintiff*,

v.

ANDY WILSON, in his official capacity as Attorney General of Ohio; ANDROMEDA MORRISON, in her official capacity as Interim Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of theSt Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; and CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission,

*Defendants*.

Case No.: 26-1502

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This action seeks to prevent imminent and irreparable harm arising from Ohio's threatened enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement that the Constitution and Congress prohibit. Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Ohio's threatened

enforcement through its protectionist licensing regime violates the U.S. Constitution's Commerce Clause and is preempted by the Commodity Exchange Act ("CEA").

2. On the view that lawful derivatives are sports gambling, Defendants demand that Polymarket US's nationwide exchange contort itself to fit a state regulatory scheme designed for in-State casinos. It is a felony to operate "sports gaming" in the State without a license issued by the Ohio Casino Control Commission ("Commission"). Ohio Rev. Code § 3775.99(B)(9). But the few licenses that are available go only to those with an in-State physical presence. *Id.* § 3775.04(A)(3). When parceling out those licenses, the Commission is further directed to take into account *how much* of a "physical presence" the applicant has in Ohio, the duration of the applicant's in-State presence, as well as the extent of "any expenditures for physical infrastructure" within the State. *Id.* § 3775.041(C). Assuming a license *were* available, Polymarket US's operations would not just have to be run from Ohio, *see* Ohio Admin. Code 3775-9-02(C); Ohio Rev. Code § 3775.11(C)—they would be limited to serving *only those physically present in Ohio*, cutting the company off from the rest of the United States, *see* Ohio Rev. Code § 3775.11(A); Ohio Admin. Code 3775-17-01(A), (D). These discriminatory, balkanizing measures violate the Constitution's promise of open, interstate commerce. And, under settled precedent, they are unlawful.

3. Ohio's attempt to regulate Polymarket US is unlawful for a second, independent reason: Through the CEA, Congress vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets. Among the financial instruments subject to the CFTC's exclusive jurisdiction are event contracts, a type of derivative whose value depends on the outcome of real-world events. Polymarket US offers event contracts for trading on a CFTC-regulated exchange. Exercising its comprehensive, exclusive authority, the CFTC decides whether

to prohibit certain event contracts as contrary to the "public interest." 7 U.S.C. § 7a-2(c)(5)(C). Despite this congressional grant of authority, the State has claimed for *itself* the power—backed by the threat of fines—to decide whether federally regulated trading may take place at all, asserting "jurisdiction over all persons conducting or participating in the conduct of sports gaming in the State of Ohio." Ex. 1 (Cease and Desist Letter) at 1–2.

4. Ohio is attempting to relitigate a debate Congress settled over 50 years ago. Back then, too, States treated derivatives trading as unlawful gambling—just as Ohio today accuses Polymarket US of "bookmaking . . . in violation of Ohio civil and criminal law." Ex. 1 at 2. That is one reason why, in 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over certain derivatives "traded or executed on a contract market designated" under the Act. 7 U.S.C. § 2(a)(1)(A). And when States objected, Congress answered by spelling out the "Jurisdiction of States" in the Act itself: A State may sue to enforce the CEA only against persons "*other than* a contract market"; Congress preserved the State's jurisdiction to wield state law only when bringing an enforcement action "on the basis of a[] . . . general civil or criminal antifraud statute." 7 U.S.C. § 13a-2 (emphasis added). In other words, Congress has already decided that the enforcement Ohio threatens is not Ohio's to pursue.

5. Since then, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets. And recently, in light of the "debate regarding the scope of the [CFTC]'s jurisdiction under the [CEA], particularly as it relates to event contracts," the CFTC promulgated an Interim Final Rule and Notice of Proposed Rulemaking ("NPRM") to clarify its jurisdiction over event contracts as swaps. Further Definition of "Swap" to Exclude Casino-Style Gambling Products, RIN 3038-AF81, at 4 (proposed Oct. 9, 2026) (to be codified at 17 C.F.R. § 1.3) ("Interim Final

Rule”), Ex. 2[1]; Further Definition of “Swap” — Inclusions, RIN 3038–AF82 (proposed Oct. 9, 2026) (“NPRM”), Ex. 3.[2] The NPRM defines “swap” to “expressly clarify that event contracts, including those based on sports-, politics-, cultural, and weather-related events, are swaps” under the CEA. NPRM at 11. And the Interim Final Rule seeks to affirm and codify the CFTC’s “longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC’s jurisdiction.” Interim Final Rule at 9.

6. The Sixth Circuit’s recent decision in *KalshiEX LLC v. Schuler*, 2026 WL 2884087 (6th Cir. Sept. 25, 2026), was decided against a different legal landscape. The Interim Final Rule and NPRM—promulgated under an express delegation to define certain key statutory terms—remove any doubt that the CFTC has exclusive jurisdiction, and that Polymarket US’s event contracts are swaps. Moreover, *Schuler* held that the CEA’s “exclusive jurisdiction provision displaces direct enforcement and regulatory authority pertaining to the licensing and operation of” designated contract markets—foreclosing Ohio’s demand that Polymarket US obtain a license or cease operating in the State. *Id.* at *21. *Schuler* also remains subject to rehearing and certiorari, and other courts continue to reach conclusions at odds with *Schuler*’s own. *See Coinbase Fin. Mkts. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026); *United States v. Minnesota*, 2026 WL 2150211, at *14–15 (D. Minn. July 27, 2026). As the Third Circuit also recently recognized, “the text of the [CEA] preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets].” *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

[1] https://www.cftc.gov/media/14726/IFREventContractsSwapExclusion100926/download.

[2] https://www.cftc.gov/media/14731/NRPM_EventContractsSwapInclusions100926/download.

7. The threat to Polymarket US is immediate and concrete. On October 2, 2026, the Commission sent Polymarket US[3] a letter demanding that it "immediately cease and desist from offering" sports-event contracts to persons located in Ohio "without a license issued by the Commission" and that it confirm its compliance in writing "no later than fourteen (14) days following the date of th[e] letter." Ex. 1 at 1–2. The letter warns that Polymarket US's "failure to abide by th[e] notice may result in the Commission pursuing all legal remedies and actions," including "administrative, civil, nuisance, or criminal actions." *Id.* at 2. Polymarket US therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, criminal prosecution, forced cessation of operations within Ohio, and severe collateral consequences to its nationwide operations.

8. The harm resulting from state enforcement would be irreparable. Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, and harm Ohio residents. Even the *threat* of enforcement forces Polymarket US to choose between exercising its federal right to operate nationwide and submitting to unlawful state coercion. The resulting disruption to a nationally uniform market cannot be remedied through damages. What's more, the chilling effect on lawful activity and the deprivation of Ohio residents' access to a federally regulated exchange are precisely the harms Congress sought to prevent when it vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets.

---

[3] The letter was addressed to "PM US Tech (QC Tech LLC)," not QCX LLC d/b/a Polymarket US.

9. Defendants suffer no cognizable harm from being barred from enforcing laws in a domain the Constitution and Congress removed from state control. The State's local interests are already governed and safeguarded by the CFTC's exclusive federal oversight. By contrast, absent judicial intervention, Ohio's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen the state law is likely preempted," "the harm to the state . . . is diminished" and "the public interest" "is less significant").

10. For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, maintain the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.

**JURISDICTION AND VENUE**

11. This is an action for declaratory and injunctive relief brought under 42 U.S.C. § 1983, and the Court's equitable powers, *see Ex parte Young*, 209 U.S. 123 (1908), to enforce the Commerce Clause and the Supremacy Clause of the United States Constitution. The federal questions presented are (1) whether Ohio state law—including Ohio Revised Code Chapters 2915, 3767, and 3775—violates the Commerce Clause as applied to Polymarket US by discriminating against interstate commerce; and, (2) to the extent those same laws purport to regulate or prohibit Polymarket US's activities governed exclusively by federal law (or otherwise conflict with federal law), whether state law is preempted by the CEA. This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12. This Court has personal jurisdiction over the Defendants. The Defendants are domiciled and perform their duties in Ohio.

13. Venue is proper in this District under 28 U.S.C. § 1391(b). All Defendants are residents of the State of Ohio, and a substantial part of the events giving rise to the claims occurred in this District.

**PARTIES**

14. Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York. Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts. Polymarket US is a contract market that is federally licensed and regulated by the CFTC pursuant to the CEA.

15. Defendant Andy Wilson is the Attorney General of Ohio. This suit is brought against Attorney General Wilson in his official capacity.

16. Defendant Andromeda Morrison is the Interim Executive Director of the Ohio Casino Control Commission. This suit is brought against Interim Executive Director Morrison in her official capacity.

17. Defendant Thomas J. Stickrath is the Chair and Commissioner of the Ohio Casino Control Commission. This suit is brought against Chair Stickrath in his official capacity.

18. Defendant Penelope Cunningham is the Vice Chair and Commissioner of the Ohio Casino Control Commission. This suit is brought against Vice Chair Cunningham in her official capacity.

19. Defendant Sheetal Bajoria is a Commissioner of the Ohio Casino Control Commission. This suit is brought against Commissioner Bajoria in her official capacity.

20. Defendant Scott Borgemenke is a Commissioner of the Ohio Casino Control Commission. This suit is brought against Commissioner Borgemenke in his official capacity.

21. Defendant Triffon Callos is a Commissioner of the Ohio Casino Control Commission. This suit is brought against Commissioner Callos in his official capacity.

22. Defendant Keith Cheney is a Commissioner of the Ohio Casino Control Commission. This suit is brought against Commissioner Cheney in his official capacity.

23. Defendant Christopher Smitherman is a Commissioner of the Ohio Casino Control Commission. This suit is brought against Commissioner Smitherman in his official capacity.

24. Defendants Wilson, Morrison, Stickrath, Cunningham, Bajoria, Borgemenke, Callos, Cheney, and Smitherman have the power and duty to enforce Ohio's laws, including the laws preempted by federal law. Ohio Rev. Code § 109.02; *id.* chs. 3772, 3775; *see* Ex. 1 at 1–2.

## FACTUAL AND LEGAL BACKGROUND

### A. Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.

25. This case is about derivatives, financial instruments that derive their value from an underlying asset or event. Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

26. One common kind of derivative is a "swap." Swaps are financial contracts where two parties agree to exchange (or swap) payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

27. An event contract, in turn, is a swap that is settled "based on the outcome of an underlying occurrence or event." CFTC, *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35806, 35807 n.1 (June 12, 2026); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").

28. Event contracts allow participants "to manage price risks around whether events stated in the contracts will occur." 91 Fed. Reg. at 35807.

29. Events may relate to "sporting events, elections, official government action . . . the weather," or anything else of "potential financial, economic, or commercial consequence." *See* CFTC Complaint ¶¶ 32, 33*, United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. 1 ("CFTC Minn. Compl."); 7 U.S.C. § 1a(47)(A)(ii). The CFTC's recent Notice of Proposed Rulemaking would "expressly clarify" that point. NPRM at 11; *see id.* at 39–40 (proposing to define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural, and weather-related events.").

30. Still, event contracts are nothing new. Since 1992, "Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on interests other than price-based interests," including interests "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669, 25671 (May 7, 2008). In 1993, for example, the Commission authorized the Iowa Electronic Markets to list contracts pegged to presidential elections. *Id.* at 25670 & n.5; *see also* 91 Fed. Reg. at 35813. In 2004, "the Commission first designated a prediction market as a designated contract market." 91 Fed. Reg. at 35807.

31. Event contracts often have a "binary payoff structure." 91 Fed. Reg. at 35807 n.1. One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position). The terms of the contract specify its payout and expiration date. For example, the parties might take a position on whether Columbus will get more than three feet of rain (the approximate yearly average) in 2026. At the

end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not. If 2026 turns out to be an especially wet year and Columbus sees four feet of precipitation, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

32. Event contracts have any number of uses. For example, they can be used to "address[] categories of risk for which traditional financial instruments either do not exist or provide only imperfect hedges." 91 Fed. Reg. at 35866. The Columbus Zoo and Aquarium might purchase an event contract predicting that the city will have a particularly rainy summer. If the weather turns out as the Zoo predicted, the payout from the contract could offset the Zoo's loss of revenue from decreased attendance.

33. Event contracts can have enormous predictive value. Because they can be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome. Consider a market on anticipated summer rainfall. As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the contract's value. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it. The result is that the price of the contract will reflect the overall market's view, in real time, about the probability of the outcome. And those probabilities are set by trading activity, not fixed odds. That is true whether the contract concerns summer rainfall or if the Cavaliers will win the Eastern Conference. While a sportsbook names a price and takes the other side of every wager, an exchange's prices emerge from the collective judgment of market participants trading with one

another. That structural difference makes participating in an exchange inherently different from "betting" on the same question.

34. As the CFTC observed in its recent Notice of Proposed Rulemaking, prediction markets "are rapidly increasing in popularity with the American public both as a financial asset class and as a source of reliable information for news media, sports leagues, financial institutions, and everyday Americans." 91 Fed. Reg. at 35807. Because traders put capital at stake, prediction markets incentivize accurate predictions. And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls. *See* 91 Fed. Reg. at 35831.

35. When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts. *E.g.,* M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[4]

36. The same is true of elections. Through the final days of the 2024 election campaign, for example, prediction markets accurately predicted President Trump would win a decisive victory, despite the view of many pollsters that the race would be considerably closer.[5]

37. Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to

---

[4] https://tinyurl.com/2zm5axpc.

[5] *See* Allison Morrow, *How prediction markets saw something the polls and pundits didn't*, CNN (Nov. 8, 2024, at 5:00 ET), https://www.cnn.com/2024/11/08/business/polymarket-election-trump-nightcap; James Bickerton, *Mystery 'Trump Whale' Speaks Out After Winning $50 Million by Defying Polls*, Newsweek (Nov. 8, 2024, at 10:57 ET), https://www.newsweek.com/trump-whale-trader-wins-50-million-election-polls-1982768.

trade; more participants means more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide real-time information about events that matter to the public at large.

### B. Over the past century, federal regulation of exchange-traded derivatives has become extensive—and exclusive.

38. For about as long as derivatives trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling. "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

39. The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

40. Congress buttressed this federal scheme a decade later with the CEA, but initially left the States a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chicago*, 331 U.S. 247, 255 (1947).

41. By the 1970s, however, exchanges had become too important to the national economy to permit the "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41333 (1973). So Congress created the

CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Merrill Lynch*, 456 U.S. at 356, "to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC," *Flaherty*, 172 F.4th at 230.

42. To that end, Congress provided that the CFTC would regulate "all" commodity futures when traded on a CFTC-designated contract market. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). "The statutory definition of 'commodity' is extraordinarily broad and includes practically all goods, articles, services, rights and interests except for onions (due to a history of market manipulation) and movie box-office receipts (because of Hollywood lobbying)." Chairman Michael S. Selig, *WSJ Op-Ed: States Encroach on Prediction Markets*, CFTC (Feb. 17, 2026).[6] Congress granted the CFTC "*exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A) (emphasis added). "The purpose of this was to separate the functions of the new CFTC from those of the SEC and other regulators," including state regulators. *Leist v. Simplot*, 638 F.2d 283, 314 (2d Cir. 1980); *see Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980) ("Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states.").

43. Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority. *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist,* 638 F.2d at 322; *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v.*

---

[6] https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

*Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

44. State officials protested this change. A state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 383 (1978). By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states." *Id.* at 363–64. And a Secretary of State demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.

45. In 1978, Congress responded to those complaints by adding to the CEA a section titled "Jurisdiction of States." Pub. L. No. 95-406, § 15, 92 Stat. 865, 872 (codified as amended at 7 U.S.C. § 13a-2). That section allows a State to sue to enforce the CEA when any person "other than a contract market" "has engaged in, is engaging in or is about to engage in, any act or practice constituting a violation of" the Act. 7 U.S.C. § 13a-2(1). The only state-law proceedings Congress preserved are those "on the basis of an alleged violation of any general civil or criminal antifraud statute." *Id.* § 13a-2(7). The corresponding Senate Report explained why contract markets were excluded: "Plenary authority to register, regulate, and discipline the contract markets" was "reserved to the [CFTC]." S. Rep. No. 95-850, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113. Not long after, the Sixth Circuit explained that the 1978

amendment and the Senate Report "resolved the ambiguity with respect to the states' role in the Commodity Futures industry." *Kelly*, 691 F.2d at 803 n.8.

46. Congress reaffirmed the preemptive effect of the CFTC's exclusive jurisdiction in 1982. When amending federal securities laws to preempt state gaming laws, members of Congress explained that a similar amendment to the CEA was unnecessary: "Similar application of state laws would not apply to futures contracts," because "the CEA gives the CFTC exclusive jurisdiction over futures trading thereby preempting state anti-gaming and bucket shop laws, as well as other state laws." H.R. Rep. No. 97-626, pt. 1, at 9 (1982) (Conf. Rep.).

47. In 2000, Congress broadened the statutory definition of "commodity" to include any "occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, app. E, § 101(4), 114 Stat. 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)).

48. Following the 2008 financial crisis, Congress again changed the regulatory landscape. The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

49. *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction. As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

50. Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

51. *Second*, the Act introduced what is known as the "Special rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). "By creating a specific public-interest review process, Congress signaled that these contracts fall within the [CFTC]'s exclusive regulatory purview, not the States'." CFTC Minn. Compl. ¶ 60.

52. Were there any doubt, Congress vested the CFTC with "exclusive authority to enforce" Dodd-Frank's swaps provisions, including the Special Rule governing event contracts. 7 U.S.C. § 6b-1(a). And, to ensure consistency and clarity, Congress directed the CFTC to "further define the term[] 'swap.'" 15 U.S.C. §§ 3801, 8321(b). All told, the CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether they involve "gaming," and to prohibit them based on the CFTC's view of the public interest. 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C). And a "purpose of the CEA is to promote responsible innovation," albeit under the watchful eye of the CFTC. 91 Fed. Reg. at 35829.

53. The CFTC has recently exercised its authority to further define the term "swap." On October 9, 2026, the CFTC issued an interim final rule confirming that "wagers placed on sportsbooks and casino games" are outside the ambit of the agency's regulatory authority, and that "tradable instruments," including "[e]vent contracts," remain well within the CFTC's exclusive jurisdiction. Interim Final Rule at 9, 15, 17.

54. The same day, the CFTC published a Notice of Proposed Rulemaking to ensure that the definition of "swaps" includes sports-, politics-, culture-, and weather-related event contracts as swaps and therefore within its exclusive jurisdiction. NPRM at 1.

55. The CFTC issued both rules in direct response to decisions—including the Sixth Circuit's in *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087 (6th Cir. Sept. 25, 2026)—that, in the agency's view, had "deviate[d] from the plain text of the 'swap' definition" and "impose[d] atextual limitations on the concept of an 'event.'" Interim Final Rule at 9 (citing *Schuler*, 2026 WL 2884087, at *11). The Interim Final Rule, effective upon publication in the Federal Register, codifies the CFTC's longstanding position that casino-style gambling products are not swaps and thereby "clarif[ies] the boundaries between the Commission's jurisdiction over the derivatives markets and State and Tribal jurisdiction over casino-style gambling." *Id.* at 1, 9. The NPRM, exercising the CFTC's "express statutory authority to 'further define' the term 'swap,'" would confirm by regulation that event contracts—including sports-related event contracts—are swaps, providing an "independent legal basis" for that conclusion and "facilitat[ing] uniform nationwide treatment of event contracts under the exclusive jurisdiction of the Commission." NPRM at 13, 31; *see* 15 U.S.C. § 8302(d)(1). In doing so, the CFTC undermined the premise on which *Schuler* rested—establishing once again that contract-market-traded event contracts are swaps within the CFTC's exclusive jurisdiction, and casino-style gambling products are not.

**C. The CEA sets forth the comprehensive regulatory framework for event contracts.**

56. The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework. Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a). That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

57. The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles." 17 C.F.R. § 38.3(a)(2); see 7 U.S.C. §§ 7(d), 8(a). Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2). And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

58. The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts. *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market" and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). These rules, the CFTC has explained, "establish important protections for derivatives markets, market participants, and the general public." CFTC Minn. Compl. ¶ 43.

59. In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate. As the CFTC has explained, contract markets are "self-regulatory organizations[] subject to Commission oversight" that must "meet[] the stringent requirements" under the CEA. 91 Fed. Reg. at 35843; *see* 7 U.S.C. § 5(b) (purpose of the CEA is to "serve the public interest[] . . . through a system of effective self-regulation of trading facilities").

60. Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

61. More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement, restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D. The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

62. The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations. Order of Designation at 3, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).[7]

63. Today, Polymarket US specializes in contracts concerning real-world events of public interest. Since September 30, 2025, Polymarket US has self-certified various financial, election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products (listing self-certifications for contracts).[8]

64. These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

65. One example is event contracts based on which political party will control the United States Senate or United States House of Representatives following the November 3, 2026, elections. Businesses, investors, financial institutions, and consumers routinely adjust their behavior based on which party will control Congress because legislative control can affect taxation, spending, regulation, and other matters with significant economic effects.

66. Another example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii); *see Coinbase*, 2026 WL 2969682, at *7 ("Winning a title game

---

[7] https://www.cftc.gov/filings/documents/2025/orgdcmqcexorderofd250709.pdf.
[8] https://tinyurl.com/yamausyk.

likely 'associate[s] with a potential financial, economic, or commercial consequence.'"). Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike. In 2025, for example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize off the team's success.[9] Retailers also regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[10]

67. Sports-related event contracts are not the same as sportsbooks. The financial products and regulatory regimes differ in fundamental ways.

68. Event-contract prices are formed by matching buyers and sellers among diverse market participants, with users from any given state transacting with other users around the country on these nationwide exchanges. Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers. Interim Final Rule at 14. The basic structure of sports betting and derivatives markets is different. Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market without any input by Polymarket US—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on

---

[9] *See, e.g.*, Rachel Moore, *Eagles to Generate $1.2B Economic Impact with Super Bowl parade season*, PHL17 News (Feb. 13, 2025), https://phl17.com/phl17-news/eagles-to-generate-1-2b-economic-impact-with-super-bowl-parade-season/; Jensen Toussaint, *Philadelphia Eagles Valuation Likely to Skyrocket After Second Super Bowl Win*, Philadelphia.Today (Feb. 14, 2025), https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/.

[10] *See, e.g.*, *Buffalo Wild Wings (@bwwings)*, Instagram (Feb. 8, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); Talia Naquin, *Cavs fans can score free Wendy's Frostys: Here's how*, FOX 8 News (Oct. 9, 2025), https://fox8.com/news/cavs-fans-can-score-free-wendys-frostys-heres-how/ (offering free Wendy's Frostys the day after a "high-energy scoring burst" by the Cavaliers); Little Caesars, *Little Caesars Road to the Super Bowl Sweepstakes*, https://tinyurl.com/LittleCaesarsSBSweepstakes (last visited Feb. 8, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform).

a given event. *Id.* at 14–15, 17–18. And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the bet. *Id.* at 14, 17–18. Polymarket US, however, does not operate as a counterparty in the derivatives market. Instead, it operates as a transparent, centralized exchange matching orders of third parties. Polymarket US also makes money in a way that is neutral—by charging a flat fee for each transaction. It does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event. *Id.* at 18.

69. Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets. That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures. Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities." *Id.*

### E. The CFTC has vigorously defended its exclusive jurisdiction over designated contract markets.

70. The CFTC has resisted States' attempts to encroach upon its exclusive jurisdiction over designated contract markets. It has publicly advocated for its exclusive prerogative to regulate event contracts, assertively pursued litigation, and acted as an amicus in support of private parties' fights against states' jurisdictional overreach.

71. Earlier this year, CFTC Chairman Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two

decades" and have played an "important role . . . in the broader financial system."[11] He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest." *Id.* To protect its jurisdiction, he directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives." *Id.* "The CFTC will no longer sit idly by," he admonished, "while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products."[12]

72. The CFTC has followed through with this warning. In recent months, the Commission has sued numerous States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets.[13]

73. The CFTC explained that those state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee the derivatives industry," and would "undermine[] [the] uniformity" Congress mandated, *see* CFTC Minn. Compl. ¶¶ 7, 82, by subjecting CFTC-regulated

---

[11] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

[12] *Chairman Michael S. Selig: Op-Ed: States Encroach on Prediction Markets*, Commodity Futures Trading Comm'n (Feb. 17, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

[13] *See* Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. 1; Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. 1; Complaint, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. 1; Complaint, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. 1; CFTC Minn. Compl.; Mot. to Intervene & Proposed Compl. in Intervention, *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), Dkt. 19; Complaint, *United States v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), Dkt. 1 ("CFTC N.M. Compl.").

exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," CFTC Press Release No. 9206-26, *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets* (Apr. 2, 2026)[14]. The CFTC also emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which prohibits States from "invad[ing]" that authority. *See, e.g.*, CFTC Minn. Compl. ¶¶ 9, 32. Those federally regulated markets include Polymarket US. *See id.* ¶ 44.

74. The result would be a "massive sea change" that poses "existential" harm to national markets. CFTC Amicus Brief 20, 28, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Sept. 9, 2026), Dkt. 51.1 ("Second Circuit Br."). The CFTC's suits and motions for preliminary injunctions against states like Connecticut, Illinois, Minnesota, New Mexico, New York, Rhode Island, and Wisconsin thus aim "to halt [state] efforts to apply and enforce preempted state laws to national markets that are governed by federal law." *See, e.g.*, CFTC N.M. Compl. ¶ 1.[15]

75. A federal district court recently preliminarily enjoined Minnesota from enforcing state law against CFTC-regulated contract markets, including Polymarket US. *Minnesota*, 2026 WL 2150211, at *10–15. The court held that the CEA's "exclusive jurisdiction" language likely expressly preempts state regulation of event contracts that qualify as "swaps," and emphasized the breadth of that definition—an event contract qualifies where "the occurrence of

[14] https://www.cftc.gov/PressRoom/PressReleases/9206-26.

[15] *See* Mot. for Prelim. Inj., *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Sept. 11, 2026), Dkt. 102; Mot. for Prelim. Inj., *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. June 17, 2026), Dkt. 31; Mot. for Prelim. Inj., *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026), Dkt. 25; Mot. for Prelim. Inj., *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 18, 2026), Dkt. 13; Mot. for Prelim. Inj., *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 34; Mot. for Prelim. Inj., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 29, 2026), Dkt. 23; Mot. for Prelim. Inj., *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. May 1, 2026), Dkt. 6.

an event has the capacity to result in the identified consequence in the future." *Id.* at *12–15. Most recently, on October 2, 2026, the Northern District of Illinois preliminarily enjoined Illinois from enforcing state law against a subset of sports-related contracts "dependent on who will win or lose a title game." *Coinbase*, 2026 WL 2969682, at *5. In granting the preliminary injunction motion, the court concluded that the state laws Illinois attempted to enforce against prediction markets "likely conflict[] with the [CEA] and [are] accordingly likely preempted." *Id.* at *16.

**F. Defendants pursue Polymarket US and other events-market operators for state law penalties.**

76. Whereas the CFTC regulates nationwide derivatives markets, Ohio's Sports Gaming Act legalized sports wagering in Ohio—under a regime designed to favor local businesses and prevent interstate competition.

77. Ohio issues its mandatory online sports-gaming licenses—type A sports gaming proprietor licenses—only to applicants that maintain "at least one operational place of business in this state" or operate a sports gaming facility in Ohio. Ohio Rev. Code § 3775.04(A)(3). And it directs the Commission to "give preference to . . . professional sports organizations, casino operators, or video lottery sales agents, subject to [] factors" such as "[t]he nature of the applicant's current or intended physical presence" in Ohio, the "length of time" "the applicant has been doing . . . business in" Ohio, and other "intended contributions to the state." *Id.* § 3775.041(A), (C); *see also* Ohio Admin. Code 3775-4-02(C) (providing factors for determining whether to grant a Type A sports gaming license). The Commission must also weigh the "taxable income" each applicant pays "to its employees in this state," its "economic involvement in this state," and its contribution "to the economic development in the state." *Id.* § 3775.041(C)(3), (4); Ohio Admin. Code 3775-4-02(C)(12). A license issued on the strength of that preference must be

revoked if the holder "ceases to qualify" as an Ohio professional sports organization, casino operator, or video lottery sales agent. *Id.* § 3775.09(D)(1).

78. The Commission may license no more than twenty-five such proprietors absent a showing that "the sports gaming market in this state needs" more, Ohio Rev. Code § 3775.04(A)(2), and every other operator may offer online wagering only as a "mobile management services provider" acting "on behalf of" a type A proprietor, subject to every requirement imposed on the proprietor itself, *id.* §§ 3775.01(G)(1), 3775.05(E)(1)–(2). A proprietor may contract with a second mobile management services provider only if it is one of the preferred in-state licensees (a professional sports organization or a casino operator or video lottery sales agent) and shows that the second contract "would generate an incremental economic benefit to this state." *Id.* § 3775.05(A)(1)(b). The Commission's rules make the same in-state economic benefit the measure of whether additional type A licenses are "need[ed]," of every applicant's fitness, and of whether a license may be kept. Ohio Admin. Code 3775-4-02(C)(10)–(12), (K)–(L), 3775-4-02.1(B)(1)(b). None of the national online operators that serve Ohioans holds a type A license in its own right; each—FanDuel, DraftKings, BetMGM, Caesars, bet365, Fanatics, and ESPN Bet, among others—appears on the Commission's list only as a management services provider operating under contract with one of those Ohio proprietors.[16] So the only path to an Ohio license today runs through an Ohio place of business or affiliation with a business located in Ohio.

[16] *See* Ohio Casino Control Comm'n, Sports Gaming Proprietors and Services Providers (last updated Oct. 16, 2025), https://dam.assets.ohio.gov/image/upload/v1745509283/casinocontrol.ohio.gov/licensing/sports%20gaming/Sports_Gaming_Proprietor_and_Services_Provider_Applicants_List.pdf.

79. These laws serve no apparent purpose beyond protectionism. If the State's concern was licensee suitability, for example, the Ohio Casino Control Commission separately conditions licensure on suitability, financial, integrity, and responsible-gaming requirements. Ohio Rev. Code § 3775.02(B)(6)–(8), (10)–(11), (F)(2); Ohio Admin. Code 3775-4-01, 3775-4-02. Applicants must submit audited financial statements and undergo a "complete investigation" of their qualifications. Ohio Rev. Code §§ 3775.02(F)(2), 3775.04(D)(3). And the Commission may accept "another jurisdiction's license" as evidence of a mobile management services provider's fitness, *id.* § 3775.05(B)(2); *see also* Ohio Admin. Code 3775-4-02(C)(9), a surefire sign that the in-state presence, payroll, and "economic involvement" requirements serve no apparent purpose other than favoring businesses located in Ohio.

80. To place local businesses at a *further* competitive advantage, Ohio law requires that "[t]he server responsible for accepting wagers through an online sports pool shall be located in a secure facility in this state," Ohio Rev. Code § 3775.11(C), and the Commission's rules similarly require that "[t]he sports gaming system servers, or other equipment, responsible for accepting wagers must be located within the state of Ohio," Ohio Admin. Code 3775-9-02(C).

81. There is no obvious nonprotectionist rationale for this requirement, either. The Commission's own rules provide that the in-state server requirement "does not prohibit sports gaming data from being stored or accessed elsewhere, including cloud-based environments," *id.*; those rules require every proprietor to give the Commission "read-only remote access to its sports gaming systems" wherever those systems sit, *id.* 3775-16-01(D); and they guarantee the Commission "access to real-time geofence data" from the licensed location-based technology provider, *id.* 3775-9-03(C). Ohio even permits its sports gaming proprietors to manage risk "through the use of a liquidity pool in another jurisdiction." Ohio Rev. Code § 3775.10(D).

82. But that is not all. If a sportsbook wishes to do business as an Ohio-licensed online sports pool, it may only accept wagers from those in Ohio. Ohio Rev. Code § 3775.11(A). Ohio law permits a type A proprietor to accept wagers only from individuals "who are physically located in this state" and requires it to "use location based technology to prohibit individuals who are not physically present in this state from participating." *Id.*; *see* Ohio Admin. Code 3775-17-01(A), (D). As the Sixth Circuit has summarized, Ohio requires that wagers on sporting events be "initiated, received, and completed within the state." *Schuler*, 2026 WL 2884087, at *3.

83. Ohio officials apparently believe that this balkanized, protectionist regime should apply to interstate derivatives trading. Two weeks ago, the Commission sent Polymarket US and nine other businesses the cease and desist letter at issue here, citing *Schuler* as having made "clear that Ohio's sports gaming laws apply to Polymarket's sports event contracts." Ex. 1 at 2.

84. The letter invokes the Commission's "jurisdiction over all persons conducting or participating in the conduct of sports gaming in the State of Ohio," and asserts that, "by offering 'event contracts' on sporting events to persons located in the State of Ohio, without a sports gaming license," Polymarket US "is violating Ohio law," and that "[p]lainly stated, Polymarket is operating online sports gaming." Ex. 1 at 1. The letter further asserts that Polymarket US "is clearly engaged in bookmaking or facilitating bookmaking in violation of Ohio civil and criminal law." *Id.* at 2. The letter "demands that Polymarket cease and desist from offering, participating in offering, or facilitating those who offer sports event contracts in Ohio," including "soliciting or accepting orders for sports event contracts listed on [contract markets] from persons located in Ohio," "as well as operating [a contract market] that offers sports event contracts to persons located in Ohio," and directs Polymarket US to "notify the Commission in writing no later than fourteen

(14) days following the date of th[e] letter that it has complied." *Id.* It warns that Polymarket US's "failure to abide by th[e] notice may result in the Commission pursuing all legal remedies and actions against Polymarket, including, but not limited to, administrative, civil, nuisance, or criminal actions pursuant to R.C. Chapters 2915, 3767, and 3775." *Id.* It threatens "a civil penalty or fine" in "an amount equal to the money or value of the property that Polymarket has unlawfully obtained or retained by offering these event contracts on sporting events to persons located in Ohio." *Id.* The letter further warns that the Commission "may also pursue additional civil and administrative remedies against Polymarket, its officers, directors, and holding or parent companies." *Id.*

85. The State's theory is that Polymarket US's federally regulated event contracts are "wagers" on "sporting events" within the meaning of Chapter 3775 of the Ohio Revised Code, and that Polymarket US is therefore "operating online sports gaming" that may not be offered to Ohioans "without a sports gaming license." Ex. 1 at 1. On that theory, Polymarket US may continue to offer its event contracts to Ohioans only by obtaining a license from the Commission and submitting to the Commission's regulatory oversight, including state requirements governing where its servers are located, where its customers are located, and with whom it does business. *See* Ohio Rev. Code §§ 3775.03(A)(1), 3775.04(A)(3), 3775.05(E)(2), 3775.11(A), (C). But it is for the federal government—not the States—to determine what qualifies as a "swap." *See* 7 U.S.C. § 2(a)(1)(A) (granting CFTC exclusive jurisdiction "with respect to" swaps traded on designated contract markets); 15 U.S.C. §§ 8302(d)(1), 8321(b) (directing CFTC to "further define the term[] 'swap'"); 7 U.S.C. § 6b-1(a) (vesting CFTC with "exclusive authority to enforce" the Act's provisions on swaps).

86. The State's fourteen-day deadline leaves no doubt that enforcement against Polymarket US is imminent. The Commission has demanded that Polymarket US capitulate by October 16, 2026, or face the full range of Ohio's civil and criminal remedies. Polymarket US does not hold an Ohio sports wagering license because Ohio may not lawfully require a CFTC-designated contract market to obtain one as a condition of listing federally regulated event contracts. Nor could Polymarket US obtain such a license if it tried. Ohio reserves its online sports-gaming licenses to proprietors with an Ohio place of business or a contractual relationship with a qualifying Ohio-based proprietor, and the Commission has warned existing licensees that partnering with a prediction market will jeopardize their own licenses. *See infra* ¶¶ 98–100. And although Polymarket US runs its markets in accordance with and subject to the exclusive jurisdiction of federal law, Ohio has taken the position that those activities are governed by state law.

**G. Looming enforcement of preempted Ohio law irreparably harms Polymarket US.**

87. Given the State's definitive position—that prediction markets violate Ohio's sports gaming laws—Polymarket US faces the imminent threat of enforcement by Ohio.

88. The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy. Because Polymarket US must choose between protecting its rights under federal law and facing exposure to imminent state enforcement, this action is ripe for adjudication and the award of injunctive relief now, not after irreparable harm has occurred.

89. The business consequences for Polymarket US arising from Ohio's near-certain enforcement require this Court's immediate action. An enforcement action by Ohio—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing

key partnerships crucial to the company's growth. Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

90. The alternative—abruptly terminating Ohio users' access to event contracts and unwinding their current positions—is just as damaging. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off Ohioans from Polymarket US's event contracts—contracts that are available to users outside Ohio—would deal a decisive blow to Polymarket US's goodwill and reputation within the state. It would disrupt overall liquidity and impair the information that trading generates by forcing Ohio residents off the exchange. And it would create confusion among users about what shutting off their access to the market means for their trading positions. Unwinding existing contracts, in particular, would confuse and frustrate both Ohioans and users on the other side of the contracts.

91. Further, reduced liquidity would deter customers from using the platform. Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users). Reduced liquidity dampens both, which are necessary elements of prediction markets' functions, so termination of Ohio-based trading hinders the orderly functioning of markets nationwide and could deter customers outside Ohio from using the platform at all, imposing substantial burdens on interstate commerce.

92. All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge liability," on the one hand; or "suffer the injury of obeying the [preempted] law" on the other. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992); *see Coinbase*, 2026 WL 2969682, at *17 (prediction markets "must choose between ceasing business operations

and facing imminent civil and criminal penalties under laws that are likely preempted"). There is therefore "no adequate remedy at law." *Id.*

**COUNT I**

**Violation of the Commerce Clause**

**(42 U.S.C. § 1983)**

93. Polymarket US incorporates the preceding paragraphs by reference.

94. Ohio's threatened enforcement action, based on its underlying state-licensing regime, violates the U.S. Constitution's Commerce Clause by discriminating against out-of-State commerce.

95. The Commerce Clause's grant of authority to Congress "implicitly includ[es] a negative component forbidding certain state regulations," at the "very core" of which "is an antidiscrimination principle." *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 486 (6th Cir. 2025).

96. Laws that discriminate against interstate commerce—"facially, purposefully, or in practical effect," *id.* at 487, "face a virtually *per se* rule of invalidity," *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (internal quotation marks omitted).

97. Ohio insists that Polymarket US is "operating online sports gaming" and may not offer its event contracts to Ohioans "without a sports gaming license," Ex. 1 at 1, but that sports gaming regime is discriminatory from beginning to end. Under Ohio law, the same conduct is criminal "bookmaking" when conducted without a license and lawful when conducted by a licensee, Ohio Rev. Code § 2915.02(A)(1), (C); Ex. 1 at 2, the only variable is the license, and the license turns on an applicant's presence in Ohio.

98. Start with Ohio's licensing restrictions. Online sports-gaming licenses are available only to proprietors that maintain "at least one operational place of business in this state" or operate a sports gaming facility in Ohio—with statutory preference for Ohio's casinos, racinos, and professional sports organizations—or to operators acting on those in-State businesses' behalf. Ohio Rev. Code §§ 3775.01(G)(1), (Z), 3775.04(A)(3), 3775.041(A), (C), 3775.05(E)(2). "Thus, physical presence in the state is the distinguishing factor that gives in-state [businesses] benefits that out-of-state [businesses] do not share," making the licensing regime "facially discriminatory." *Novartis Pharms. Corp. v. Griffin*, 833 F. Supp. 3d 956, 989–90 (E.D. Ark. 2026); *see Energy Mich.*, 126 F.4th at 487–88 (laws whose benefits or burdens are "territorially based" discriminate on their face). Indeed, Ohio law expressly contemplates "exchange wagering," Ohio Rev. Code § 3775.01(O)(2), but its licensing scheme effectively excludes an exchange operated from outside the State.

99. The provision also discriminates against out-of-State business in practical effect. Imposing on out-of-State businesses the obligation to partner with an in-State business imposes costs on out-of-State businesses that in-State competitors need not bear—again, in violation of the Commerce Clause. *See*, *e.g.*, *Granholm*, 544 U.S. at 474 (regulatory scheme was unconstitutional because it "require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers"); *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 442–43 (6th Cir. 2000) (Ohio licensing scheme that allowed out-of-State manufacturers to sell in Ohio only through agreements with in-State franchised dealers discriminated against interstate commerce in purpose and effect).

100. The only route Ohio offers an out-of-State operator is dependent on an Ohio proprietor's willingness to contract with it. Ohio Rev. Code § 3775.05(A), (E)(2). But the

Commission has threatened that a decision to "associate, coordinate, or otherwise partner directly or indirectly with entities offering or facilitating the offering of sporting event contracts in Ohio" will bear on a proprietor's "continued suitability" to hold a license and that the Commission "may take administrative action against any licensee that does." Letter from Matthew T. Schuler, Exec. Dir., Ohio Casino Control Comm'n, to Sports Gaming Licensees (Aug. 25, 2025), at 56–59, *Schuler*, No. 2:25-cv-1165 (S.D. Ohio Oct. 7, 2025), Dkt. 1-5. In effect, Ohio has announced that national contract markets like Polymarket US *cannot* comply with Ohio's scheme, short of becoming an Ohio-based company.

101. The State's discriminatory licensing provisions are not "narrowly tailored to 'advance a legitimate,'" "nonprotectionist" "local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518, 539 (2019). Ohio law *separately* subjects every licensee to suitability, financial, integrity, and responsible-gaming requirements. Ohio Rev. Code §§ 3775.02(B)(6)–(8), (10)–(11), (D), (F)(2), (I)(1); *id.* §§ 3775.04(D)(3), 3775.10(A)(9), (B); Ohio Admin. Code 3775-16-10, 3775-16-17. And it is "mere speculation" to suppose that maintaining a place of business in Ohio or partnering with an Ohio casino or sports team is necessary—much less "narrowly tailored"—to advance some legitimate, nonprotectionist purpose. *Tenn. Wine*, 588 U.S. at 518, 539.

102. Ohio law imposes yet another unlawful physical-presence requirement. The obligation that "[t]he server responsible for accepting wagers through an online sports pool" "be located in a secure facility in this state," Ohio Rev. Code § 3775.11(C); *see* Ohio Admin. Code 3775-9-02(C), compels an out-of-State business like Polymarket US that operates a single nationwide market from centralized infrastructure to build and operate a duplicate Ohio installation as the price of serving Ohio residents.

103. This is precisely the kind of restriction that the Supreme Court has long "viewed with particular suspicion"—a rule "requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Granholm*, 544 U.S. at 475.

104. Nor is this restriction necessary. The Commission's own rules make clear that out-of-State storage and remote oversight are viable and compatible with whatever state interest the Commission might seek to advance. *See* Ohio Admin. Code 3775-9-02(C), 3775-16-01(D), 3775-9-03(C); *see also* Ohio Rev. Code § 3775.10(D) (permitting sports gaming proprietors to manage risk through "a liquidity pool in another jurisdiction").

105. In addition to its unlawful physical-presence requirements, Ohio's licensing regime erects a barrier to interstate commerce through its geofencing provisions: Licensees may accept bets from those present in Ohio—and nowhere else. Ohio Rev. Code § 3775.11(A). This kind of law—one that overtly blocks the flow of interstate commerce at a State's borders—is, the Supreme Court has said, "[t]he clearest example" of unlawful protectionism. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). By barring transactions that cross state lines, Ohio excludes out-of-State market participants from transactions that would otherwise occur in interstate commerce.

106. Ohio's sports gaming laws therefore violate the Commerce Clause as applied to Polymarket US.

107.

**COUNT II**

**Commodity Exchange Act Preemption**

**(42 U.S.C. § 1983; *Ex parte Young*)**

108. Polymarket US incorporates the preceding paragraphs by reference.

109. The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

110. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal quotation marks omitted).

111. Courts "will give preemptive effect to federal law where (1) a federal statute expressly preempts state law, (2) a federal law impliedly preempts state law, or (3) federal law and state law actually conflict." *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 948–49 (6th Cir. 2002).

112. The CEA bars Ohio from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

113. Polymarket US brings this claim pursuant to 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), and seeks declaratory and injunctive relief preventing Defendants from enforcing Ohio law against Polymarket US in violation of federal law. As explained below, Ohio's gaming laws are preempted by the CEA as applied to Polymarket US's federally regulated exchange.

**A. Express preemption bars Ohio regulation of Polymarket US's exchange.**

114. Congress expressly preempted state regulation of event-contract trading on designated contract markets.

115. Under the CEA's express terms, the CFTC, not the Ohio Casino Control Commission, has "exclusive jurisdiction with respect to" all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are

"traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A); *see Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560–61 (6th Cir. 1998) (discussing pre-Dodd-Frank version of the Act).

116. Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

117. The CFTC's "exclusive jurisdiction" over trading on federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts Ohio's supposed jurisdiction to police those exchanges. *See Minnesota*, 2026 WL 2150211, at *10 ("[C]ourts have recognized that § 2(a)(1)(A)'s 'exclusive jurisdiction' language has a preemptive effect on state regulation."); *Flaherty*, 172 F.4th at 230 (observing that the CEA's "text preempts state gambling laws that seek to regulate . . . event contracts traded on a [contract market]" under the CFTC's exclusive jurisdiction); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002) (concluding it is "manifestly clear" that a statutory grant of "exclusive jurisdiction" "preempt[s] . . . state statutes").

118. That conclusion holds even under the Sixth Circuit's narrower reading of § 2(a)(1)(A). In *Schuler*, the court recognized that "the exclusive jurisdiction provision displaces direct enforcement and regulatory authority pertaining to the licensing and operation of [contract markets]." 2026 WL 2884087, at *21. And it held Ohio's laws not preempted as applied to Kalshi only because, in its view, those laws "impose no restrictions on the designation or operation of contract markets as such," but instead "regulate sports betting." *Id.* at *22. The Commission's letter to Polymarket US, however, does what *Schuler* says Ohio's laws do not. It asserts "jurisdiction over all persons conducting or participating in the conduct of sports gaming," treats

a Commission-issued "sports gaming license" as a condition for operating a federally designated exchange, and directs Polymarket US to cease "operating [a contract market] that offers sports event contracts to persons located in Ohio." Ex. 1 at 1–2. That is direct regulation of the licensing and operation of a designated contract market.

119. Take, for example, Ohio law's definition of "wager": "to risk a sum of money or thing of value on an uncertain occurrence," Ohio Rev. Code § 3775.01(DD).

120. That definition echoes the CEA's definition of a swap, which includes "any . . . transaction . . . that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial . . . consequence." 7 U.S.C. § 1a(47)(A)(ii). When a transaction qualifies as a swap within the meaning of the CEA, the CFTC, not Ohio, has "exclusive jurisdiction." *Id.* § 2(a)(1)(A). The CFTC—the agency Congress charged with administering the CEA—has now confirmed that reading. *See* NPRM; Interim Final Rule.

121. In addition, Section 13a-2 of the CEA bars Ohio from enforcing its gambling laws against a designated contract market. Congress defined the extent of state authority to proceed against conduct the CEA regulates. 7 U.S.C. § 13a-2. A State may sue a person who violates the CEA or CFTC regulations, but Congress expressly excluded "contract market[s]" from that authority. *Id.* § 13a-2(1). And Congress preserved only one category of state law actions, namely proceedings brought under a State's "general civil or criminal antifraud statute." *Id.* § 13a-2(7).

122. These two limitations foreclose Ohio's threatened enforcement. *First*, Congress excluded contract markets by name. 7 U.S.C. § 13a-2(1). Congress withheld that authority to sue because "[p]lenary authority to register, regulate, and discipline the contract

markets" is "reserved to the Commission." S. Rep. No. 95-850, at 25. Congress could not have intended to deny States authority to enforce the CEA against contract markets while simultaneously permitting them to achieve the same result through state gambling laws. *See Kelly*, 691 F.2d at 803 n.8. *Second*, Congress preserved only actions brought under "general civil or criminal antifraud statute[s]." 7 U.S.C. § 13a-2(7). When Congress specifically identifies the state law claims that may coexist with a federal regulatory scheme, the remainder are preempted. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982).

123. *Schuler* does not suggest otherwise. The Sixth Circuit did not address § 13a-2(1)'s exclusion of contract markets from state enforcement authority or the Sixth Circuit's earlier discussion of § 13a-2 in *Kelly*. Rather, *Schuler* addressed only § 13a-2(7)'s preservation of state "general civil or criminal antifraud statute[s]"—the limited carve-out described above—and otherwise described § 13a-2 as "permit[ting] state officials to bring enforcement actions . . . relating to *off*-[contract-market] transactions." 2026 WL 2884087, at *24 (emphasis added).

124. Ohio says that Polymarket US is offering "unlicensed sports gaming and bookmaking or facilitating bookmaking." Ex. 1 at 2. That is not true. *See supra* ¶¶ 67–69. Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts. 7 U.S.C. § 7a-2(c)(5)(C). Thus, even if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B. Implied field preemption bars Ohio regulation of Polymarket US's exchange.**

125. Field preemption applies where Congress "indicates an intent to occupy exclusively an entire field of regulation," an intent that may be inferred from a federal regulatory scheme "so pervasive as to make reasonable the inference that [it] left no room for the States to

supplement it." *Bibbo*, 151 F.3d at 562 (internal quotation marks omitted). Through the CEA, Congress has done just that for event-contract trading on designated contract markets. "As the scope of the CEA and the long history of amendments to it make clear, Congress created 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" CFTC Minn. Compl. ¶ 89 (quoting *Merrill Lynch*, 456 U.S. at 356).

126. "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. And through this "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended, Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned." *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982).

127. The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33476, 33477 (June 4, 2013)).

128. There is no room for state interference with this "comprehensive scheme." *See CFTC v. British Am. Commodity Options*, 560 F.2d 135, 138 (2d Cir. 1977).

129. Enforcement of Ohio's sports gaming or gambling laws against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-

regulated exchanges. *See, e.g.*, *Flaherty*, 172 F.4th at 228 (affirming that "at the very least[,] field preemption applies" to sports-related event contracts on a designated contract market).

**C. Conflict preemption bars Ohio regulation of Polymarket US's exchange.**

130. Conflict preemption also prevents enforcement of these Ohio laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); *see also Flaherty*, 172 F.4th at 229 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed [contract markets].").

131. Consider the State's position that Polymarket US's federally regulated sports-event contracts are unlawful "wagering products" and that, by offering those contracts to Ohioans, Polymarket US is "operating online sports gaming" and "engaged in bookmaking" in violation of state law. Ex. 1 at 1–2. That is not the State's decision to make: the CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" and, if so, whether they should be prohibited as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

132. Common sense confirms all this. The Chicago Mercantile Exchange, for example, is not the MGM Grand, though a customer of either might end up losing money. But if States were free to regulate derivatives as gambling—subject to each State's rigid-yet-idiosyncratic restrictions and licensing regimes—the modern financial system would cease to function. The CEA ensures that this cannot happen.

133. The CFTC has not invoked the Special Rule to prohibit Polymarket US from listing sports-event contracts. Therefore, Polymarket US's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to

permit them. *See Flaherty*, 172 F.4th at 226 ("The Act preempts state laws that directly interfere with swaps traded on [contract markets].").

134. More broadly, if Ohio attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, the State's actions would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. As the Supreme Court has recognized, "[t]he purpose of the exclusive-jurisdiction provision" is, among other things, to "separate the functions of the [CFTC] from those of . . . other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386. As the Sixth Circuit has recognized, "the thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere." *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982). That is, "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states." *Kelly*, 691 F.2d at 804 n.12; *cf.* 15 U.S.C. § 8325(a) (directing the CFTC to achieve "consistent *global* regulation of swaps" (emphasis added)). Permitting an Ohio enforcement action against Polymarket US would conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own varying laws. "This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. The CFTC itself has found that state-level enforcement actions "imperil a nascent industry that Congress has entrusted to the 'exclusive jurisdiction' of a federal agency, the CFTC," and that stripping the agency of exclusive jurisdiction over event contracts "threatens to wreak havoc on the operations of [contract markets] nationwide." Interim Final Rule at 29.

135. Compliance with both regimes is also impossible in practice. Federal law requires a designated contract market to provide "impartial access to its markets and services" on a non-discriminatory basis, 17 C.F.R. § 38.151(b), and the CFTC has explained that a contract market that restricts access by geography in order to comply with state gambling laws violates that requirement, Second Circuit Br. 18. Ohio's demand that Polymarket US stop "operating [a contract market] that offers sports event contracts to persons located in Ohio," Ex. 1 at 2, would require Polymarket US to do exactly that. Although the Sixth Circuit in *Schuler* was "not persuaded" that the impartial-access rule required Kalshi to serve Ohio participants, 2026 WL 2884087, at *26, the agency that wrote and administers that rule reads it otherwise, and Polymarket US preserves the argument for further review.

136. In short, Ohio may not enforce against Polymarket US state laws that federal law preempts.

**PRAYER FOR RELIEF**

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that Ohio's sports gaming and gambling laws, including Ohio Revised Code Chapters 2915, 3767, and 3775 and Ohio Administrative Code 3775-1-08, are unconstitutional as applied to Polymarket US and preempted under the CEA;

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from taking any steps to enforce Ohio Revised

Code Chapters 2915, 3767, or 3775, Ohio Administrative Code § 3775-1-08, or any other state law or regulation to the extent it discriminates against interstate commerce in violation of the U.S. Constitution's Commerce Clause, purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law, or otherwise conflicts with federal law;

C. An award of Plaintiff's attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988 for successful 42 U.S.C. § 1983 claims; and

D. Any other relief within this Court's discretion that it deems just and proper.

Dated: October 16, 2026

Respectfully submitted,

/s/ _Keith Shumate_____________

SQUIRE PATTON BOGGS
Keith Shumate (#0056190)
2000 Huntington Center
41 South High Street
Columbus, OH 43215
Telephone: (614) 365-2834
keith.shumate@squirepb.com

Colin R. Jennings (#68704)
1000 Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8420
colin.jennings@squirepb.com

GIBSON DUNN & CRUTCHER LLP
Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
Liesel Schapira*
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com
lschapira@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

** Pro hac vice applications forthcoming*

*Attorneys for Plaintiff QCX LLC, d/b/a Polymarket US*